UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x

25-CV-1297(DG)

NEWSDAY LLC,

Plaintiff,

-versus-

NASSAU COUNTY, ET AL.,

Defendants.

------------------------------x

United States Courthouse
Brooklyn, New York

July 08, 2025
4:00 p.m.

TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
BEFORE THE HONORABLE DIANE GUJARATI
UNITED STATES DISTRICT JUDGE

APPEARANCES

For the Plaintiff: BALLARD SPAHR LLP
BY: LYNN B. OBERLANDER, ESQ.

For the Defendant: WILLKIE FARR & GALLAGHER LLP
BY: JEREMY BYLUND, ESQ.
JOSHUA MITCHELL, ESQ.

Court Reporter: Rivka Teich, CSR, RPR, RMR, FCRR
Phone: 718-613-2268
Email: RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court.)

THE COURTROOM DEPUTY:  All rise.  Newsday LLC against the defendants Nassau County, Nassau County Legislature and Bruce Blakeman in individual capacity.

Is counsel for the plaintiff ready?

MS. OBERLANDER:  Yes.

THE COURTROOM DEPUTY:  State your appearance.

MS. OBERLANDER:  Lynn Oberlander for Newsday.

THE COURT:  Good afternoon.

MR. BYLUND:  Jamie Bylund on behalf of all defendants from Willkie Farr & Galagher.

MR. MITCHELL:  Joshua Mitchell on behalf of all defendants.

THE COURT:  Good afternoon to both of you.

We're convened today in connection with the anticipated motion by the defendants for dismissal.  I reviewed the submissions.  I'm familiar with the case law that you cited in your submissions, but I want to hear more from the defendants.  First, about your anticipated motion and then I'll turn to plaintiff for any response or anything additional you'd like to raise.  There is also a request or an indication that the plaintiff is going to be requesting further leave to amend, you can address that as well.

I'd like to hear you if you can focus initially on the First Amendment issue.

MR. BYLUND: Yes, your Honor. I guess to take the amendment issue first. I guess it would be our proposal that if plaintiff is going to leave to amend that we take care of that. They can file their motion and we respond before we file or motion to dismiss, so we file one motion to dismiss just for efficiency, judicial resources. And I guess, we would propose that 45 days after either the second amended complaint is filed or that motion is denied, we'll file our motion to dismiss.

THE COURT: Do you take a position on the anticipated request for leave?

MR. BYLUND: So we need to look at it but we do have some concerns about futility, which we will argue based on what is raised by plaintiff.

THE COURT: Then I don't know that I need to have plaintiff go through a formal motion practice if we're here together today if there is agreement. If you're going to fight the amendment then I suppose we can go through motion practice; I think that is probably not the best use of resources. What I would expect is that if leave to amend is in fact sought and granted, amendment would come very quickly.

MR. BYLUND: Your Honor, we do have a concern about the Home Rule law and the disability under Article III. We don't think that plaintiff falls within the zone of interest that is intended for the Home Rule law. And second, we don't

think there justiciability on that issue, and that's our futility concern.

We don't mean to waste your time. We do think we have colorful arguments. We don't know exactly what they are going to raise in the second amended complaint, base on the latter, we do have those principles.

THE COURT: We can take that up in a little bit; why don't you start with the First Amendment.

MR. BYLUND: Primarily moving for dismissal on immunity grounds for both. The legislators in their personal individual capacity and then also Bruce Blakeman. We think that they qualify for legislative immunity; if not, then for qualified immunity.

Under legislative immunity, Executive Blakeman was making a recommendation to the legislature that we think that was a legislative act under the Orange County v. Suffolk case, 830 F. Supp. 701. We think that the legislators in promulgating the rule at issue and then in designating the New York Post, were engaged in legislative activity. We do understand that there is the Decker opinion out there --

THE COURT: I was going to ask you how you distinguish Decker. Obviously Decker is not binding, but the issues raised there do overlap with the issues raised here considerably.

MR. BYLUND: Sure, your Honor. I have two responses

to that.

First, we don't know how Decker can be squared with Bogan v. Scott-Harris, 523 U.S 44, or with Freeman which is a Second Circuit case 2023 Westlaw 7013409. Both of those cases talk about how discretionary decisions have been made by budgetary priorities and services are legislative acts.

Because we're talking about allocating money and contractors for the County of Nassau, under those cases we struggle to see how that's not a legislative act.

The other thing I would say about Deckers, is I think the situation is just fundamentally different than in Decker. In Decker the newspaper was only two months into its incumbency, meaning it had just been designated two months prior. What we have here is a yearly designation process, and that at that year mark the legislature in due course chose the New York Post instead of Newsday. We just think it's fundamentally different.

If you look at Decker decision, what they focus on is the fact that firing an employee doesn't seem like a legislative act. I think that's why those facts I just mentioned about Decker are applicable. Here, like I said, it's at yearly designation process that's set out in the charter that is at issue, not an individual act against Newsday.

We think that these were legislative acts and

legislative immunity.

We also have a qualified immunity argument. We don't see any clearly established statutory constitutional right that was violated here. I just wanted to note, there is a lot of concern here I think about, a lot of rhetoric, about maybe political or policy considerations being taken into place. But I want to note that the New York statute Section 212 expressly talks about political affiliation of newspapers. So it's hard for us to understand how our clients could have violated a clearly established right, when that law has been on the books since 1909. Sorry, excuse me, that was Section 214.

THE COURT: Do the defendants agree that plaintiff is an independent contractor for purposes of the First Amendment analysis?

MR. BYLUND: We do not. Because the incumbency had ended. Every year they start a new designation. We do not agree and do not agree that they are a contractor.

What I will say, I think under either standard, either looking at the employee standard or the private party standard, we don't think that plaintiffs inner complaint have alleged 1983 action for violation of the First Amendment. I think some of the primary problems with that is the causality issue. The allegations are primarily against Executive Blakeman for comments he made, but it's the legislature who

took the action. And that transcript of the legislative action is referenced and incorporated into the complaint. And you can see in that transcript, your Honor, what the legislators' reasons were for the designation that they made. The reasons were a lack of candor by Newsday about their circulation numbers and concern about access.

So, under either standard we don't see that that designation act can be a violation of the First Amendment.

THE COURT: What is your best argument against the intentionality argument that plaintiff raises?

MR. BYLUND: So I think that there is a causal break between the intention that they are pointing to and actual action, the actual action being the designation which is done by the legislature, which is done for reasons that is in the public record, like I said about access and a lack of candor.

I think my other argument is on, immunity intention doesn't matter. The only reason we would get to intention is if we're looking at trying to get liability against one of the counties like the Governmental entities.

I think the problem there is, then you have to look at Monell.

And under Monell you have to look to see whether there is an official policy. We don't think, if you look at the face of the policy that was passed, it was updating the way in which the paper was designated in June then designating

New York Post in December. We don't see anything on the face of that, or anything in the reasoning of the legislators that says anything about retaliation, says anything about discrimination.

THE COURT: Anything else to raise with me before I turn to your adversary?

MR. BYLUND: Just that, once the First Amendment claim fails, you have these complicated state-wide claims. We think they fail for a variety of reasons which you've seen. And we would just encourage you not to exercise supplemental jurisdiction over those if the First Amendment claim is dismissed. And I think that that is in accord with this Court's case law --

THE COURT: Which section of the Home Rule law controls here, 23 or 34?

MR. BYLUND: 34, your Honor. So 34 is about charter laws; and since this was an amendment of a charter, it's a charter law.

If you look at 23, 23 basically says this applies unless something else applies. Then you look at 33 and 34, and it's a more specific law about charter laws.

If you look at the charter law itself, there is this 60-day period in which a referendum can be sought, which didn't happen, and then the law becomes affective, et cetera.

Taking a step back, we have real concerns about

Article III standing over that in the first place.

Then on the records issue, we don't see allegations in the compliant that there was ever a request for the documents at issue, or that the resolution was scheduled. Under the text of that clause, which is Section 103, it doesn't look like our client was, therefore, obligated to provide it in advance. It is on the website, you can find it it's on the website. It's not that it hasn't been posted. I think the concern is maybe it wasn't posted enough in advance. Those our arguments on the state law claims.

Again, we don't think supplemental jurisdiction should be extended to those if the First Amendment claim is dismissed.

THE COURT: Thank you. I'll turn to Ms. Oberlander.

MS. OBERLANDER: Thank you, your Honor. So as to the -- I do want to discuss the amendment, the proposed amendment to the complaint.

As to the Section 1983 First Amendment retaliation, we actually think it's very clear that we have met our burden in pleading in the complaint as to what needed to happen under the standard that is appropriate. I can respond to a few of co-counsel's complaints.

First of all, the way that it actually had worked in Nassau County for years was that there was an official newspaper pursuant to the county charter. There were actually

allowed to be two official newspapers, one chosen by each of the main political parties. My counsel is correct there was always a political ramification in that, but what that was was that both political parties got to chose an official newspaper, then the official in notices got posted in that.

It just so happened that Newsday was the choice of both political parties for many years. It wasn't that the contract was terminated every year and then re-uped. It was that -- we don't have, we actually will want this in discovery -- I don't believe that there was a new resolution passed every year where they said now this year it's going to be this. Certainly there were some years that it was passed, but the interim Newsday was still the official newspaper of choice of both political parties.

THE COURT: So your position is that at all relevant points in time Newsday was an independent contractor and the case should be evaluated under that lens.

MS. OBERLANDER: Yes. We think it's also very clear that both, there was a retaliatory campaign based on Newsday editorial perspectives and based on its viewpoint. We think there is evidence that county Executive Blakeman individually engaged in retaliation, where he told his staff that they were not to respond to Newsday's queries. Where he engaged in a holy war where he publically critiqued. He was very unhappy with Newsday coverage of his actions, and that happened

starting in March of last year but continued all the way through, including until on the record after the New York Post was made the official newspaper, he went on air, he went on podcasts, he said I don't like their comments, we don't like their coverage. We think the evidence is very clear, frankly, that that was the reasoning behind the retaliatory taking away of the official newspaper or the attempt to take it away.

So we do think that the standard set out in Decker as to what you need to show for a retaliation claim has been met. I know you have it in front of you, but to survive dismissal we would have to show alleged facts establishing that we engaged in protected speech, that we suffered an adverse employment action that was caused by the protected speech. We think we've alleged that satisfactorily in the amended complaint.

THE COURT: Do you want to speak to the issue of legislative immunity with respect to the individual?

MS. OBERLANDER: Yes. First of all, we did not sue the individual legislators. So that issue -- and the legislative immunity belongs to the individual legislators, not to the legislature as a whole, who we sued. We don't think that matters at all.

THE COURT: Of Blakeman.

MS. OBERLANDER: Yes. And for county Executive Blakeman, we would obviously brief this more fully, but we

don't believe he was engaged in legislative activity in terms of doing this, such that he doesn't get legislative immunity.

We also, in terms of his activity as qualified privilege, we think that the evidence -- not the evidence -- the allegations and what we believe the evidence will show is that he was deeply and personally involved. It wasn't just in his official capacity that he was individually involved in the retaliation and the viewpoint discrimination, and for that reason we don't think that he should be subject to a qualified privilege for his individual -- he is sued in his individual capacity not just individual.

Furthermore, we still just to be clear, have a claim against the county. And there is no question of immunity against the county at all.

So we think certainly at this stage that we should be entitled to go forward, seek discovery, and see what has gone on.

Now, as to the state law claims. So as I mentioned, there has been -- first of all, it's in the -- now that I feel much more of an expert, it's in the New York Constitution, it's in the county charter, and in the municipal Home Rule, all of which say that if you curtail a legator's powers, in term of legislative activity, you have to subject it to a referendum before that becomes affective. Now, we pled in our amended complaint that the operative provision was Section 23.

We believe that -- and that calls for a mandatory referendum -- we still believe that applies. However, this comes to our amendment, counsel has suggested that in fact it's Section 23 of the -- Section 34 of the Municipal Home Rule, which calls for a permissive referendum. In either case, the county the defendants did not -- they violated the law in terms of setting this up.

Section 34 says that you have to wait 60 days under permissive resolution before an act becomes affective for it to be valid. And you have to provide notice to the legislators and to the public that they can seek a referendum on this, neither of which was done.

And to the -- I want do point out, there is a Court of Appeals case on this that, so we think it's quite clear. The citation if you'd like, we'll obviously put it in our brief.

THE COURT: If you have it I'll take it. Thank you.

MS. OBERLANDER: Marin v. Foster 45 NY 2d. 287. In that case the Court of Appeals found invalid a law that had been adopted by a county legislature provided that it would take affect upon filing in the Office of New York Secretary of State without provision for permissive referendum. There, because there was no provision for permissive referendum, the Court of Appeals said the law was improperly passed and was null and void.

And so, we think that's pretty clear, frankly. The reason we would like to amend the complaint -- and this is the beauty of the premotion process -- counsel suggested that we had really brought, noticed the wrong claim, although the ultimate facts are the same, whether there was a referendum allowed, and at this point we would seek to amend, to add, a violation of Section 34. Also of the state constitution and the county charter provisions. That would be the --

THE COURT: Do you want to speak to the issue of standing?

MS. OBERLANDER: I don't understand it. Frankly, it's not really whether there is it Article III justiciability. I don't understand why there wouldn't be. There have been cases on this here.

First of all, there is clearly, as we suggested, a First Amendment violation under the law. We think that the Decker standard is the appropriate standard. There is plenty of Supreme Court law that suggests that in fact Government contractors have First Amendment rights --

THE COURT: I don't think that the argument was that you lack standing on the First Amendment claims. Correct?

MR. BYLUND: Correct. Under the Home Rule law.

THE COURT: That's what I think I'm focusing on.

MS. OBERLANDER: Under the Home Rule law, I mean, we, Newsday, was directly affected by the change in law. But

they weren't, just to be clear, directly affected until December when the county legislator, pursuant to what we believe is a null and void law, changed the official newspaper designation.

So under Supreme Court precedent, under FDA, there was activity. We were harmed, my client was harmed substantially by the change in designation. We think that is a sufficient, frankly, to give us standing at this moment.

The other thing, just a minor point on the second state law claim, which is about the Open Record Act violation. The resolution that the official newspaper designation was going to come up at this meeting on December, was not on the agenda. It's not just that the text of the proposed resolution wasn't made public, it's that it was not put on the agenda at all. So the idea that you don't have a right because you didn't ask about something that wasn't on the agenda, is to us, frankly, ludicrous. We think there is an Open Meetings violations on that point.

THE COURT: Is there anything else you would like to raise?

MS. OBERLANDER: Only that I will just say that I think this, when you look at the state law claim about how official newspapers were -- I did -- were supposed to be designated, there has always been this understanding that it is, to some degree, a political decision. And that is why

statutorily, in at least Nassau County, the legislators for the two political parties each got to chose an official newspaper. And that was part -- that is actually part of what the charter called for. And frankly, in Decker Upstate the charter was different, but it also required, it also provided for two newspapers. So this is not new.

And so what happened here is county Executive Blakeman came in and said, I'm going to make a recommendation. And first we're going to change the law, so I can recommend it. It is true that the legators still get to decide, but all of a sudden it becomes a majoritarian choice as opposed to having each of the parties being able to chose their own newspaper.

Furthermore, just to respond to counsel's comment that this was no indication that there was anything other than complaints about lack of transparency or lack of transparency or the ability of the public to access these notices. First of all, there is factual -- those statements were inaccurate, in that circulation numbers are freely and publicly available. Also, any member, I don't know if you live in Long Island, but anyone who lives in Long Island or anywhere can actually access the legal notices for free. It's not behind a pay wall.

So, while in fact there was testimony at the hearing in December that they said, well, you can't access it. It

that was inaccurate.

Furthermore, going back to last June, when the proposed law was put forth, there is also -- we have we cite it in our complaint in a footnote -- there was discussion even then that people were unhappy with Newsday. People meaning, certain legislators were unhappy with Newsday's coverage in general and coverage of the transgender ban in specific. That's in the transcript as well.

I don't think it's enough to say that there were these neutral determinants, because we think that, frankly, on the official records, in the testimony, and as well in public statements, it was pretty clear that it was the point of discrimination.

THE COURT: I'll turn to defendants for any response.

MR. BYLUND: Your Honor, a couple of responses. I think on the Article III standing issue, Gizzo v. Town of Mamaronek, 36 A.D. 3d 162, is pretty clear that to bring a challenge under the Home Rule law you need to be a voter that was deprived of the referendum right. So Newsday simply doesn't have a right to challenge the home rule law. I guess secondarily, even if they were successful, under the Old Charter Law, Section 2211, for a newspaper to be designated they have to have a circulation of at least 50,000 per day. Newsday's own complaint says they don't have that circulation.

They don't even qualify for designation under the Old Charter language. Because of that, we don't think there is repressibility or Article III standing.

On the curtailment issue. So, setting aside that standing issue, on the curtailment issue it's always been the legislature's prerogative to designate the paper, and it still is. Blakeman just provides a recommendation, that's not binding, and the legislature decides. We don't think there is a curtailment.

Then I guess about this discussion about the reasons that the legislature gave. The criticism of Newsday in that of transcript was from a democratic who voted against designating the New York Post. He criticized Newsday him for misquoting him and being inaccurate. So there is consternation by both political parties about the inaccuracy of Newsday, I want to point out. But the reasons given by the legislature, whether they are factually inaccurate or not, are the reasons that the legislators gave for their action, and they are not actionable.

Going back to the First Amendment claims, sorry to skip around here. When you're thinking about the issues, aside from the designation, I think there are two primary concerns. One is a lack of access to news coming out of the county. And then the second, is a lack of advertising being done in the newspaper.

The problem for the plaintiffs, though, is that they admit in the complaint at paragraphs 48 and 49 that they always still receive the distributions from Nassau County; it's just that one person received them. And second, they concede in paragraphs 51 and 76 that Nassau County does still in fact advertise in Newsday to some extent.

Their argument is really not about a blackout. Their argument is that they are getting less than they got before. We don't think that rises to a level of a First Amendment violation; certainly not one that can overcome qualified immunity.

The only other issue I'd like to raise, I don't know if I'll speak again, is that given that we're dealing with immunity we don't think that discovery is appropriate until you decide the immunity issue. I think that's pretty clear in the Francis v. Coughlin case, 849 F.2nd 778. In that case it says when you have officials who are being sued, and if they are immune, they should not be saddled with the burden of discovery. That's one of the points of immunity doctrine, that's quoting Mitchel v. Forsyth U.S. Supreme Court case.

THE COURT: Okay. Is there anything else to respond to that; if not, I can talk next steps?

MS. OBERLANDER: No, please, your Honor.

THE COURT: So there is a request for amendment. I take it that it's opposed at this point?

MR. BYLUND: Yes, your Honor.

THE COURT: So I think there are a couple of ways to proceed. I don't know that it makes sense and it's necessary for the parties to do extensive briefs on the amendment issue. I think that will probably just slow things down, and I think what defendants probably want is to get on to a motion to dismiss. So I can take letter briefs, if you want to be heard further on the amendment issue. Because it wasn't the subject of course of the premotion conference letters, I will need to have something from you in writing. I don't know whether -- how quickly you can do that.

MS. OBERLANDER: Well, your Honor, can I respond now just to utility argument?

THE COURT: Yes.

MS. OBERLANDER: Just to be clear, I appreciate now, although it's not in their promotion letter, that they are claiming that any amendment would be futile because there is no claim at all, whether it's 23 or 34, or what have you. But we would suggest that, first of all, in term of the amendment of the complaint we're well within, there is no prejudice in terms of going forward. There is no -- it's efficient rather than having them write an entire motion to dismiss, then you giving us leave to refile with this claim here. We're well before -- there is no court order to say we need to make a motion, we're not past the time for the closing of the papers.

And we don't think it's actually futile, it would be, very simple for us to amend the complaint. So we could, I appreciate that counsel is now claiming that, not now claiming, but saying they would oppose -- we could file an amended complaint by Friday, no problem. If we have to brief even with the letter brief the motion to amend, I would ask for a week from Friday, in part, because my associate is traveling right now, that would be more efficient for the client.

THE COURT: What would be the most efficient, I think, if we're talking solely efficiency, is to have you file an amended complaint, then to get on to briefing for a motion to dismiss. Of course you're not waiving any arguments with respect to those counts. I certainly don't find there is any bad faith, any undue delay, any undue prejudice. This is a relatively new case. Really the issue is futility, or not. If you want to press that issue --

MR. BYLUND: I think we --

THE COURT: Take a look at the calendar. Do you think that plaintiff is out of time?

MR. BYLUND: I think she's already amended once.

THE COURT: She has amended once.

MS. OBERLANDER: I mean, just to be clear we did amend once. We amended once because of the notice of claim requirement. But also, here we are responding to the

arguments that they put forth in their premotion papers, which is, frankly, I understood the reason to have premotion papers.

MR. BYLUND: Your Honor, I think we can fairly quickly respond to her letter brief if she files a week from Friday. We can file the following week and not drag it out. I do think my client would want to get on the record our objection based on futility. Like I said, I think we're ready to set a schedule after the adjudication of that to file a motion to dismiss.

THE COURT: Let me ask another question, which is, have the parties had any discussions about resolving this matter?

MS. OBERLANDER: No.

MR. BYLUND: No.

THE COURT: Is there any interest in having those discussions? Because I'll tell you, again, the purpose of a premotion letter practice it not to stand in the place of a motion, of course, I would like the full motions if I'm ruling on them. But it seems to me that this case most likely will not resolve entirely at the motion to dismiss stage. I'm not going to prejudge any motion that will be made, but that's based on what I've seen so far, the research that I've done, and the case law that I'm familiar with. That's my initial take based on your letters.

So I think it might very well make sense for the

parties to talk to each other, either with the help of court annexed mediation or some other mechanism.

MS. OBERLANDER: Your Honor, we are fully willing to engage in any kind of discussion to resolve this matter.

MR. BYLUND: We're happy to engage in discussions, your Honor.

THE COURT: Okay. Do you want to be referred to court annexed mediation? I always caveat that with, I'm not looking for this to expand over a long period of time and drag anything out here. We do have a really excellent court annexed mediation program, very successful. I think it might be worth the parties engaging in that process. I would ask that it be done on a relatively quick time frame.

Is that something you're interested in?

MS. OBERLANDER: We're willing to talk to the court ordered mediator. We do not want the case to be clayed while we do so, if we can go for the forward with discovery or briefing on the motions during that time, we would be perfectly happy to do that.

MR. BYLUND: I think we take no position.

THE COURT: I don't think it's necessarily that efficient to be doing mediation and also briefing. I think it's costly, it's time consuming, and I think if mediation can be done relatively quickly, which I think here it could be, that's probably the most efficient way to go. Again, the case

is pretty new, but I understand the issues are important to all parties here.

MR. BYLUND: That's fine with us, your Honor.

MS. OBERLANDER: If we can work on our amended complaint at the same time. I appreciate your commentary about briefing, I would want to -- we would want to move forward with our proposed amended complaint and then, yes --

THE COURT: Why don't I do this then. I will take letter briefs on the motion to amend.

Tell me again how much time you wanted?

MS. OBERLANDER: A week from Friday would be preferrable.

THE COURT: So that is July 18 for plaintiff's letter brief and the motion to amend.

MS. OBERLANDER: That's three-page --

THE COURT: No, I can give you five pages.

MS. OBERLANDER: Thank you.

THE COURT: And any response to that, how much time do you need?

MR. BYLUND: I don't want to take too much. Can we take the 30th, a week is a little tight to get clients to sign off.

THE COURT: July 30, response five pages, single spaced is fine.

I'll also put on the docket a referral to the

Eastern District of New York Court Annexed Mediation program. I would encourage the parties to take advantage of that. And obviously, none of this is going to preclude defendants from filing a motion to dismiss at the appropriate time should that be necessary, whether there is an amended complaint or whether we're on the -- further amended complaint -- or whether we're on the current amended complaint. One moment. Anything else?

MS. OBERLANDER: Your Honor, just to check in with you about discovery. We would like to begin our discovery and to start sending requests, but we of course don't want to do anything in violation of any court order.

THE COURT: Have you had a conference yet with Judge Lindsay?

MS. OBERLANDER: We were scheduled to have it tomorrow; then yesterday we got note that it was put off until August 14.

THE COURT: Because the discovery process will be handled by Judge Lindsay in the first instance. Any request you have as to that should be made to Judge Lindsay in the first instance.

Anything from the defendants?

MR. BYLUND: Only, your Honor, if we can have certainty about when you would like our motion to dismiss to be due if --

THE COURT: I think the first order of business is

to address the motion to amend. And typically I would try to ask the parties to agree on a schedule to propose to the Court. I think we should wait to pass this first hurdle. And maybe we won't get to the next hurdle.

I'll look out for the letter briefs. And you can look out for the referral on the docket.

Thank you for your responses to my questions and for your arguments. We are adjourned.

(Whereupon, the matter was concluded.)

*     *     *     *     *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Rivka Teich*

Rivka Teich, CSR RPR RMR FCRR
Official Court Reporter
Eastern District of New York